IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RICHARD CLAY MARTIN, | : |
| Plaintiff, | : |
| vs. | :   CIVIL ACTION 06-0361-WS-C |
| ROBERT BARNES, et al., | : |
| Defendants. | : |

REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a Complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of Defendants, Dr. Robert Barnes, Nurse Donna White, Correctional Lt. Shirley Smith, Correctional Sgt. John Skipper, and Warden Jerry Ferrell (Docs. 17, 18, 28, and 29), and Plaintiff's Opposition thereto[1] (Docs. 27, 31). For the reasons stated below, it is recommended that the motions for summary judgment of Defendants Barnes, White, Smith, Skipper, and Ferrell be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.

I. SUMMARY OF FACTUAL ALLEGATIONS

---

[1] On October 3, 2007, and November 27, 2007, Plaintiff filed motions to amend his Complaint, seeking to add an additional defendant and reasserting the allegations made in his original Complaint. (Docs. 27, 31). Having found herein that Plaintiff's allegations do not establish a constitutional violation, Plaintiff's requests to amend his Complaint are due to be denied. The Court construes Plaintiff's "Amended Complaints" as responses in opposition to Defendants' motions for summary judgment.

1. From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation.

2. At the time of the incident made the basis of this litigation, Plaintiff was an inmate incarcerated at Fountain Correctional Facility ("Fountain"), in Atmore, Alabama. (Doc. 1 at 4).

3. Plaintiff claims that, on August 28, 2005, at 5:15 p.m., he was involved in a fight with another inmate and injured his right wrist. (Id.).

4. Plaintiff's medical records show that he was taken to the prison infirmary and examined by a staff nurse who noted, "wrist has some deformity." (Doc. 17, att. 1 at 12, 45). The nurse wrapped Plaintiff's wrist in an ace bandage, secured it in a brace, and administered pain medication. (Id.). The nurse also submitted a request for an x-ray of Plaintiff's wrist. (Doc. 17, att. 1 at 12, 83; att. 2 at 63).

5. Plaintiff was then taken to segregation. (Doc. 27 at 4).

6. On August 30, 2005, Plaintiff was taken before the prison disciplinary board. (Doc. 1 at 4; Doc. 27 at 5).

7. Plaintiff was released from segregation the following day, August 31, 2005. That same day, Defendant saw Warden Ferrell and told him that his wrist was broken. (Id.). Warden Ferrell told him that he would be "[taken] care of." (Id.).

8. On September 6, 2005, nine days after the incident, Plaintiff was called to the infirmary to have his wrist x-rayed. (Doc. 1 at 4). Dr. Robert Barnes, one of the prison physicians, examined Plaintiff, noting that his wrist was "mildly swollen." The x-ray

revealed a fracture of the right distal radius.[2]  (Doc. 17, att. 2 at 63; att. 5 at 3).

9. Dr. Barnes submitted a request to Prison Health Services for Plaintiff to be seen by a specialist, Dr. Raymond Fletcher, a private orthopedic surgeon in Foley, Alabama. (Doc. 17, att. 2 at 29; att. 11 at 4).

10. Dr. Barnes instructed Plaintiff to continue wearing his splint and not to use his right hand for five weeks. (Doc. 17, att. 5 at 3; att. 7 at 3; att. 11 at 3).  He also prescribed more pain medication.  (Id., att. 7 at 3).

11. On September 26, 2005,[3] Dr. Raymond Fletcher examined Plaintiff's wrist and took a second x-ray.  The second x-ray revealed a "partially healed volar angulated fracture distal radius."  (Doc. 17, att. 2 at 21).  Dr. Fletcher performed surgery to repair Plaintiff's fracture on September 30, 2005.  (Doc. 17, att. 9 at 2).

12. Following surgery, Plaintiff returned to prison where he was admitted to the prison infirmary for post-op observation.  (Doc. 17, att. 3 at 82).

13. Dr. Barnes treated Plaintiff during his recovery, prescribing medication for pain and swelling, as well as warm soaks twice a day for his right wrist.  (Doc. 17, att. 3 at 79-80, 88; att. 11 at 4).  Dr. Barnes also continued Plaintiff's temporary work

---

[2] The radiologist's report, issued the following day, September 7, 2005, confirmed a fracture of the right distal radius.  (Doc. 17, att. 2 at 63).

[3] Plaintiff alleges that he was taken to see Dr. Fletcher on September 12, 2005, fifteen days after his injury.  (Doc. 1 at 5).  However, Plaintiff's medical records indicate that the correct date is September 26, 2005.  (Doc. 17, att. 9 at 3).  For purposes of this motion, the Court will consider the latter date, giving Plaintiff an additional delay of fourteen days before he was treated by an outside physician.

3

restrictions, ordering him not to use his right arm for an additional six weeks.[4]  (Doc. 17, att. 3 at 62).

14. On November 2, 2005, Dr. Barnes requested a follow up x-ray of Plaintiff's wrist.  The radiology report indicated, "[t]here has been a fracture of the distal radius surgically repaired with a plate in place.  The alignment is good.  Impression: healing fracture."  (Doc. 17, att. 2 at 61).

15. On November 23, 2005, Dr. Barnes examined Plaintiff and noted that x-rays of his right wrist looked "ok," but there was some stiffness and "atrophy" in the muscles between the thumb and first finger.  (Doc. 17, att. 5 at 3).  Dr. Barnes referred Plaintiff to Dr. Fletcher for evaluation and recommendation of exercises to address these problems and continued to prescribe pain medication.  (Id.).

16. On December 21, 2005, Dr. Fletcher examined Plaintiff and noted: "11 weeks 5 days post-op.  He reports little pain in right wrist.. . .  Right wrist reveals marked improvement in overall alignment.  There is good ROM noted.  X-ray right shows continued healing the distal radius osteotomy."  (Doc. 17, att. 9 at 3).  The records do not reflect that any further treatment of Plaintiff's wrist by Dr. Fletcher was necessary.  (Id.).

17.  On January 4, 2006, Dr. Barnes requested another x-ray of Plaintiff's wrist, and the radiology report indicated that "[t]he fracture is healing without significant

---

[4] The record shows that, on September 6, 2005, Plaintiff had been placed on temporary work restrictions and orders from Dr. Barnes not to use his right arm for five weeks.  (Doc. 17, att. 3 at 63).

change in position. Healing is progressing. A fracture line is now only very faintly visualized." (Doc. 17, att. 2 at 60).

## II. PROCEDURAL ASPECTS OF THE CASE

1. On June 13, 2006, Plaintiff filed the present § 1983 Complaint in this Court, seeking compensatory and punitive damages against Defendants for delaying medical treatment of his broken wrist, thereby violating his Eighth Amendment right against cruel and unusual punishment. (Doc. 1).

2. On February 26, 2007, and October 22, 2007, Defendants filed their Special Reports and Answers, denying any violation of Plaintiff's constitutional rights and asserting various defenses, including qualified and absolute immunity.[5] (Docs. 17, 18,

---

[5] Plaintiff is suing Defendants in their official and individual capacities. (Doc. 1; Doc. 27). As state officials, Defendants Smith, Skipper, and Ferrell are entitled to absolute immunity from suit for damages in their official capacities. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment). Furthermore, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). In determining whether qualified immunity is appropriate in a given case, "[t]he court must first ask the threshold question whether the facts alleged, taken in the light most favorable to the plaintiffs, show that the government official's conduct violated a constitutional right." Dalrymple, 334 F.3d at 995 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Having found herein that Plaintiff's allegations do not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

  As private entities, the remaining Defendants, namely, Dr. Barnes and Nurse White, are not entitled to immunity, whether qualified or absolute. See Swann v. Southern Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004) ("The parties agree that as a private entity, SHP [a private corporation employed by the County to provide

28, 29).

3. The Court converted Defendants' Special Reports and Answers to motions for summary judgment on June 19, 2007, and October 24, 2007.  (Docs. 20, 30).

4. As noted above, On October 3, 2007, and November 27, 2007, Plaintiff filed motions to amend his Complaint, which the Court has construed as responses in opposition to Defendants' motions for summary judgment.  (Docs. 27, 31).  These motions and responses are now before the Court.

### III. SUMMARY JUDGMENT STANDARD

1. In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

2. The Court must view the evidence produced by "the nonmoving party, and all

---

medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician" "is ineligible to advance the defense of qualified immunity"); Edwards v. Alabama Dep't of Corrections, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a private entity contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity...."). With respect to absolute immunity, Defendants have cited no case, and the Court is aware of no case, extending absolute immunity to privately employed physicians or nurses providing medical services to state inmates.

factual inferences arising from it, in the light most favorable to" that party. Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989).

3. However, Rule 56(e) states that:

> an adverse party [to a motion for summary judgment] may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 325-27.

4. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).

5. "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Custom Mfg. and Engineering, Inc. v. Midway Servs., Inc., 2007 WL 4165634, *3 (11th Cir. 2007) (citations omitted).

## IV. DISCUSSION

1. In this action, Plaintiff alleges that Defendants violated his rights under the Eighth Amendment by delaying proper medical treatment for him during his incarceration

7

at Fountain Correctional Facility.  Specifically, Plaintiff alleges that he fractured his right wrist in a fight with another inmate on August 28, 2005, and he was not taken to an outside physician for treatment until September 26, 2005.  (Doc. 1 at 4-5; Doc. 31 at 7).  According to Plaintiff, the delay in treatment by an outside physician caused him to suffer permanent pain, discomfort, and loss of use of his wrist and constituted cruel and unusual punishment.  (Id.).

2. The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

3. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs."  Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

4. In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).

5. To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).

6. A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

7. In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243.

8. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835 (1994).

> 9. The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this

9

> Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46 (emphasis in original).

    10. "Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Id.

> 11. The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Gaudreault, 923 F.2d at 208; Monmouth County, 834 F.2d at 347. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." Id. An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994) (emphasis added). Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical

>     need, deciding whether the delay worsened the medical
>     condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (emphasis in original) (footnotes omitted).

12. The Court assumes, for purposes of this motion, that Plaintiff's fractured wrist constitutes an objectively serious medical injury. Therefore, the Court turns to the second, subjective element of Plaintiff's claim, that is, whether Defendants were deliberately indifferent to Plaintiff's serious medical need.

13. Plaintiff asserts that the fact that he injured his wrist on August 28, 2005, and was not taken to see Dr. Fletcher, an offsite orthopedic surgeon, until September 26, 2005 (twenty-nine days later), constitutes "deliberate indifference" by Defendants to his serious medical need. The Court disagrees.

14. In order to constitute "deliberate indifference," Defendants must have known of and disregarded an excessive risk to Plaintiff's health. Farrow, 320 F.3d at 1245-46.

15. Assuming Plaintiff's allegations as true, on the day of the incident, Defendants Lt. Smith, Officer Skipper, and Nurse White knew that he had injured his wrist in a fight with another inmate. Plaintiff was taken immediately to the prison infirmary, and the medical staff wrapped his wrist, put it in a brace, gave him pain medication, and submitted a request for an x-ray. (Doc. 17, att. 1 at 45; att. 2 at 63).

16. Three days later, on August 31, 2005, Plaintiff complained about his wrist to Warden Ferrell. (Doc. 1 at 4; Doc. 27 at 5). Warden Ferrell assured him that he would be "[taken] care of," and, on September 6, 2005, Plaintiff was summoned to the infirmary to

have his wrist x-rayed.  (Id.).

17. On September 6, 2005, Dr. Barnes found Plaintiff's wrist to be "mildly swollen," and the x-ray revealed that Plaintiff's wrist was fractured.  (Doc. 17, att. 2 at 29, 63; att. 5 at 3; att. 11 at 4).  Dr. Barnes did not consider Plaintiff's medical condition to constitute an emergency. (Doc. 17, att. 11 at 3).  He instructed Plaintiff to continue wearing the splint and to refrain from use of his right arm for five weeks; he prescribed more pain medication; and he requested approval for Plaintiff to see Dr. Raymond Fletcher, a private orthopedic surgeon.  (Doc. 17, att. 2 at 29; att. 5 at 3; att. 7 at 3; att. 11 at 3).

18. On September 26, 2005, twenty-nine days after the incident, Dr. Fletcher examined Plaintiff, and, on September 30, 2005, Dr. Fletcher performed surgery and successfully repaired the fracture. (Doc. 17, att. 2 at 21; att. 9 at 2).

19. Plaintiff acknowledges that he received medical treatment for his injured wrist immediately following the incident and in the weeks that followed.  However, he complains that there should not have been a nine-day delay in taking an x-ray, nor should there have been an additional twenty-day delay in taking him to an offsite specialist for surgery.  While the Court agrees that it would have been better if an x-ray had been taken sooner so that the fracture could have been discovered sooner, the mere fact that there was a nine-day delay in taking an x-ray and a twenty-nine day delay in taking Plaintiff to a specialist does not establish a constitutional violation.

20. "Cases stating a constitutional claim for immediate or emergency medical

attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is *apparent* that delay would detrimentally exacerbate the medical problem." Hill, 40 F.3d at 1187 (emphasis added).

21. Plaintiff's injury in this case was not life-threatening. His medical records show that, on the night of the incident, he told the nurse, "I got in a fight and broke my wrist," and the nurse observed that the "right wrist has some deformity." (Doc. 17, att. 1 at 45). She wrapped the wrist, put it in a brace, gave Plaintiff pain medication, and requested an x-ray. Plaintiff alleges that Nurse White told Officer Skipper that his wrist "looked like it was broken" and suggested that he be taken the hospital. Officer Skipper relayed this message to Lt. Smith; however, she responded that she did not have anyone to take him and that they would take him the next day. (Doc. 1 at 4). Instead, nine days later, Dr. Barnes examined Plaintiff's wrist and took an x-ray which revealed that his wrist was fractured. Assuming Plaintiff's allegations as true, they still do not establish a constitutional violation.

22. When Dr. Barnes examined Plaintiff's wrist nine days after the incident, he noted that Plaintiff's wrist was only "mildly swollen." (Doc. 17, att. 5 at 3). It was the x-ray that revealed the fracture. (Doc. 17, att. 2 at 63). Even considering Plaintiff's opinion that his wrist was broken and the nurse's observation that the "wrist has some deformity," Plaintiff's medical condition was not so severe at that time as to make it "apparent" that his wrist was broken and that a delay in taking an x-ray, such as the nine-day delay experienced here, would detrimentally exacerbate Plaintiff's injury to his wrist.

23. Likewise, with respect to the twenty-day delay between the time that Dr. Barnes discovered the fracture and Plaintiff's first appointment with a specialist, there is, again, no evidence establishing that it was "apparent" to Defendants that this delay would detrimentally exacerbate Plaintiff's medical problem.

24. The present case is distinguishable from that of <u>Brown v. Hughes</u>, 894 F.2d 1533, 1536-37 (11th Cir. 1990), in which Defendants failed to provide any medical treatment whatsoever (including pain medication) to an inmate for approximately six hours who had broken two bones in his foot during a fight.  The evidence in <u>Brown</u> showed that Defendants knew that the inmate was complaining that his foot was broken and that he was in pain; that the inmate was limping and hopping on one leg; and that the inmate's foot had swollen so severely during that six hours that he could not be fitted for a cast for eleven days.  The Eleventh Circuit held that a jury question was presented on the issue of deliberate indifference under those circumstances.  Such circumstances are not presented here, however, where Plaintiff received immediate medical attention for his injury, including pain medication and stabilization of his wrist with a wrist brace, and where there were no obvious or apparent signs of deterioration or worsening medical condition, such as the severe swelling experienced by the inmate in <u>Brown</u>.

25. However, even if the Court were to assume that Plaintiff's need for additional medical treatment without delay was "obvious" or "apparent," Plaintiff still has failed to establish a constitutional violation.

26. "An inmate who complains that delay in medical treatment rose to a

constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill, 40 F.3d at 1188 (emphasis added).

27. While Plaintiff argues that his surgery was necessitated by Defendants' nine-day delay in performing an x-ray and additional twenty-day delay in securing offsite medical treatment by a specialist, there is no "verifying medical evidence" in the record establishing that allegation. Plaintiff's statements that Dr. Barnes and Dr. Fletcher told him that surgery could have been avoided if Defendants had acted sooner are insufficient. (Doc. 27 at 7). As for the surgery itself, Plaintiff's medical records indicate that the surgery was a success. Therefore, Plaintiff has failed to establish by "verifying medical evidence" that any detrimental effect was caused by these delays. Hill, 40 F.3d at 1188.

28. Finally, "[t]he tolerable length of delay in providing medical attention" also depends on the reason for the delay. Id. (citations omitted). While there is little evidence in the record explaining what caused the delays in securing an x-ray and an appointment for Plaintiff with a specialist, Plaintiff has presented no evidence that either delay was intended to cause him suffering or to exacerbate his injury.

29. It is a reality of prison life that appointments with physicians or for diagnostic testing for treatment of non-life-threatening medical conditions must be scheduled. It is particularly complicated when an inmate is to be seen by an offsite physician. In such instances, appointments must be made; transportation must be arranged; security must be provided to escort the inmate to the appointment and back; and priority must be given to

inmates according to the nature of their medical problems. (Doc. 17, att. 11 at 4). It is reasonable to expect some delay while arrangements are being made. Patients in the free world often experience similar delays when seeking treatment of non-life-threatening injuries or ailments.

30. "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989). "[D]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." Hill, 40 F.3d at 1189.

31. Considering all of the circumstances surrounding the treatment that Plaintiff received related to his wrist injury on August 28, 2005, including the nine-day delay in obtaining an x-ray of the wrist and the additional twenty-day delay in securing an appointment with an outside specialist, the Court cannot say that any of the Defendants were deliberately indifferent to Plaintiff's injury. Thus, Plaintiff has failed to establish the subjective element of his Eighth Amendment claim, and Defendants are entitled to summary judgment.

## V.  CONCLUSION

Based on the foregoing, it is recommended that the motion for summary judgment of Defendants, Dr. Robert Barnes, Nurse Donna White, Correctional Lt. Shirley Smith, Correctional Sgt. John Skipper, and Warden Jerry Ferrell (Docs. 17, 18, 28, and 29),  be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.

In addition, Plaintiff's motions for leave to amend his Complaint are due to be denied. (Doc. 27, 31).

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 15th day of January, 2008.

                                     s/WILLIAM E. CASSADY
                                     UNITED STATES MAGISTRATE JUDGE

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.      Objection.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      Transcript (applicable where proceedings tape recorded).  Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.